**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| DATASECTION INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>WPR LLC d/b/a WOLFPACK RESEARCH LLC, WOLFPACK CAPITAL PARTNERS MANAGER, LLC, WOLFPACK CAPITAL PARTNERS, LP, WOLFPACK CAPITAL PARTNERS GP, LLC, and DAN DAVID<br><br>*Defendants.* | Case No. _____<br><br>**Jury Trial Demanded** |

Plaintiff Datasection Inc. ("Datasection"), by and through its attorneys, as and for its Complaint against WPR LLC d/b/a Wolfpack Research LLC ("Wolfpack Research"), Wolfpack Capital Partners Manager, LLC ("Wolfpack Manager"), Wolfpack Capital Partners, LP ("the Fund"), Wolfpack Capital Partners GP, LLC ("the Fund's General Partner"), and Dan David ("David") (collectively, "Defendants"), hereby state as follows:

**INTRODUCTION**

1.      This case arises from a coordinated short-and-distort scheme: Defendants took a short position in Datasection's stock, falsely accused the company of serious export-control violations and made other false assertions, and then profited as the stock price collapsed—just as Defendants planned.

2.      Datasection is a publicly-traded technology company, headquartered in Tokyo, that specializes in data and AI-driven business solutions aimed at solving real-world problems and enabling corporate transformation.

3. Due to the nature of Datasection's business—including its reliance on tightly-controlled technologies—legal compliance is essential to Datasection's relationships with investors, lenders, commercial counterparties, and government-facing stakeholders.

4. Defendants, a short-selling outfit whose business depends on driving down the market value of its targets, recognized that reality and sought to exploit it. They first positioned themselves to profit from a decline in Datasection's share price. They then published and continue to publish a report falsely accusing Datasection of "illegally" providing restricted technologies to a supposedly "blacklisted" Chinese company, the focus of which was the alleged "scheme's blatant illegality" (the "Report"). They also repeated these claims in viral social media posts.

5. Defendants' accusations were not understood as questions, conjecture, or subjective opinions. They were instead presented as purported investigative findings of unlawful conduct—precisely the kind of accusation Defendants knew would threaten confidence in Datasection's business and drive down its share price.

6. The harm was immediate and severe—just as Defendants intended. The Report damaged Datasection's reputation, shook confidence among investors and counterparties, caused an immediate and significant drop in Datasection's share price, impaired business and financing relationships, and triggered real-world consequences for Datasection's operations, assets, and market standing. Defendants refused to retract and continue to publish the Report to this day, which has cast a shadow over Datasection's business in the highly competitive AI industry, causing Datasection to miss out on untold business opportunities, customers, and potential growth.

7. Datasection thus brings this action to hold Defendants accountable, to correct the false record they created, and to recover for the substantial harm their scheme inflicted.

**PARTIES**

8.     Plaintiff Datasection is a corporation organized and existing under the laws of Japan, with its headquarters and principal place of business located in Tokyo, Japan. Datasection is publicly traded on the Tokyo Stock Exchange under securities code 3905, the same code Defendants used to identify Datasection in the Report, captioned "Japanese Firm Datasection (TYO: 3905)."

9.     Defendant Wolfpack Research is a limited liability company organized under the laws of Delaware with its principal place of business in Hatfield, Pennsylvania. Wolfpack Research's own outside counsel identified it by the name "WPR, LLC" in written correspondence responding to Datasection's demands regarding the Report. Wolfpack Research publishes short-seller reports concerning publicly traded companies, including through the website https://www.wolfpackresearch.com/ and the "@wolfpackreports" social-media account, and profits from positions taken in connection with those reports. Wolfpack Research is owned by Defendant David and a Pennsylvania S-corp called Paillard & David Consulting Inc. and is directed and controlled by Defendant David. As relevant here, Wolfpack Research acted on behalf of itself, Wolfpack Manager, the Fund, and the Fund's General Partner.

10.     Defendant Wolfpack Manager is under common control and affiliated with Wolfpack Research. Upon information and belief, Wolfpack Manager serves as the investment adviser and manager to its affiliated hedge fund, the Fund, and, upon information and belief, operates as an alter ego of Defendant David, the Fund, and the Fund's General Partner, such that disregarding its corporate form is warranted in the interests of justice and equity. Wolfpack Manager is organized as a Delaware limited liability company formed on March 24, 2025, and has been registered to do business in Pennsylvania since June 10, 2025, where it maintains its principal

place of business in Hatfield, Pennsylvania, at Defendant David's personal residence. Wolfpack Manager is registered with the U.S. Securities and Exchange Commission as an exempt reporting adviser under CRD No. 335980, and its own filings with the SEC identify the "wolfpackresearch.com" website, the "@wolfpackreports" account on X (formerly Twitter), and the "Wolfpack Research" LinkedIn page as Wolfpack Manager's own websites and social-media accounts—directly tying the entity that manages Defendants' trading positions in Datasection's securities to the publication of the Report. According to those same filings, Defendant David is Wolfpack Manager's Chief Executive Officer and its sole control person, owning 75% or more of the company.

11.     Defendant the Fund, upon information and belief, is a private investment vehicle organized as a Delaware limited partnership formed on March 18, 2025—less than seven months before Defendants published the Report. According to filings with the U.S. Securities and Exchange Commission, the Fund held approximately $30 million in gross assets as of early 2025 and, as of May 2025, had raised $35,750,000 from eight investors in an exempt securities offering. The Fund conducts its operations solely through Wolfpack Manager and its personnel and does not maintain a separate workforce of its own. The Fund does not maintain an office independent of Wolfpack Manager's principal place of business in Hatfield, Pennsylvania, at Defendant David's personal residence.

12.     Defendant the Fund's General Partner, upon information and belief, serves as the general partner of the Fund and, like the Fund, conducts its affairs through Wolfpack Manager and its personnel. The Fund's General Partner is a Delaware limited liability company formed on March 17, 2025—one day before the Fund itself was formed—and has no office separate from

Wolfpack Manager's principal place of business in Hatfield, Pennsylvania, at David's personal residence. David serves as the managing member of the Fund's General Partner.

13.     Defendant David is the 99% owner and principal of Wolfpack Research, the Chief Executive Officer and controlling owner of Wolfpack Manager, and the Managing Member of the Fund's General Partner. David is a citizen of Pennsylvania, where he has resided in Hatfield, Pennsylvania since at least 2007—at the same address at which Wolfpack Manager, the Fund, and the Fund's General Partner each maintain their registered principal place of business. As relevant here, David was working within the course and scope of his employment for Wolfpack Research, Wolfpack Manager, the Fund, and the Fund's General Partner.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over the claims alleged in this Complaint pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. Datasection is a citizen of Japan for diversity purposes, as it is incorporated under the laws of Japan and maintains its principal place of business in Tokyo, Japan. Defendant David is a citizen of Pennsylvania. Defendants Wolfpack Research, Wolfpack Manager, the Fund, and the Fund's General Partner are each limited liability companies or limited partnerships whose citizenship, for diversity purposes, is determined by the citizenship of each of their members or partners. David is a member, manager, and/or controlling owner of each of these entities, whether directly or through one or more intermediate entities, and no member or partner of any of the Defendants are citizens of, or domiciled in, a foreign state. Complete diversity therefore exists between Datasection and all Defendants.

5

15. This Court has personal jurisdiction over Defendants because Defendant David resides in the Eastern District of Pennsylvania and, on information and belief, directed and controlled the conduct of Wolfpack Research, Wolfpack Manager, the Fund, and the Fund's General Partner from the Eastern District of Pennsylvania. Each of Wolfpack Research, Wolfpack Manager, the Fund, and the Fund's General Partner maintains its registered principal place of business in Hatfield, Pennsylvania—at David's personal residence—and is subject to jurisdiction in the Eastern District of Pennsylvania because it acted through David, its principal and controlling agent, and because the conduct alleged in this Complaint was directed, authorized, or ratified from the Eastern District of Pennsylvania.

16. Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in the Eastern District of Pennsylvania because David, who directs and controls the conduct of Wolfpack Research, Wolfpack Manager, the Fund, and the Fund's General Partner, resides and works in Hatfield, Pennsylvania, within this District. As a result, a substantial part of the events or omissions giving rise to the claims occurred in, or were directed and disseminated from, the Eastern District of Pennsylvania.

## BACKGROUND

17. Datasection is an artificial intelligence and data technology company that provides comprehensive services for data-driven management, marketing solutions, and system integration, supporting corporate challenges through advanced AI and big data utilization technologies.

18. Datasection provides data consulting, data infrastructure and AI tools development, data analysis, and data scientist training services to enable companies to become more data driven. Plaintiff also provides marketing solutions and system integration services that apply AI and big data technology to improve store sales and address other business challenges.

6

19.     Datasection is a rapidly expanding AI infrastructure provider, announcing significant investments in AI data centers powered by NVIDIA's latest GPUs—high-performance computer chips that function as the engines of modern AI systems by processing enormous amounts of data far faster than ordinary computer processors.

20.     As a publicly traded company whose AI infrastructure business depends on the procurement and deployment of export-controlled NVIDIA GPU technology, Datasection's compliance with U.S. and Japanese export-control laws is not merely a reputational concern but a threshold condition of its ability to do business. Datasection's lenders, data-center partners, and investors require confidence that its GPU sourcing and deployment comply with applicable export regulations before extending financing or entering into contracts. An accusation that Datasection is illegally supplying restricted GPU technology to a sanctioned or blacklisted end user therefore carries consequences far more severe than ordinary business criticism: it threatens Datasection's regulatory standing, its financing relationships, and its ability to continue operating its core AI data center business at all.

21.     Defendant Wolfpack Research is a "short-biased" firm founded in 2019 that holds itself out as a "global financial research & due diligence firm dedicated to protecting investors by ensuring the natural balance of the financial ecosystem."[1]

22.     Defendant Wolfpack Research's disclosures reveal that Defendants' business model depends on profiting from declines in the stock prices of the companies they purport to investigate. In a disclaimer accompanying its reports, Defendant Wolfpack Research warns readers that its reports are "short-biased opinion pieces" and, referring to Defendants more broadly, that

---

[1] *Mission Statement*, Wolfpack Research, https://www.wolfpackresearch.com/about-3 (last visited July 31, 2026).

"[o]bviously, we will make money if the price of the covered issuer stock declines." That same disclaimer discloses that Defendants "will continue transacting in the securities of [a] Covered Issuer for an indefinite period after a report," and "may be net short, net long or flat positions in the Covered Issuer's securities after the initial publication of a report"—confirming that Defendants' financial incentive to depress a target's stock price does not end upon publication. By disclosing that its affiliates may be "net long" after initial publication, Wolfpack Research also reveals that Defendants may profit at both ends of a market-manipulating short attack: covering short positions after a hit piece drives down a stock price, then purchasing long positions to benefit from the partial rebound after the accusations are shown to be false. Defendant David has long described, in his own words, the business model that his companies employed against Datasection. Before founding the Wolfpack entities, while running a different short-biased fund, David explained his approach: "I'll bet against them, and I'll write a report and I'll publish it. . . . I'll say they're a fraud, and I'll short. But when they do go to zero, I win, but you all lose."[2]

23.    Upon information and belief, Defendants' reports are built on unverified and unreliable sourcing. Defendant Wolfpack Research discloses that Defendants pay some of their sources, including former employees, indirectly through an expert network, and concedes that these paid sources "may hold a grudge against their former employer" or have a financial interest in the short report itself. Notwithstanding this compensation arrangement, Defendants mischaracterize their reports as based on "generally available information, field research, inferences and deductions."

---

2 Barbara Chai, *Why 'The China Hustle' Is a Finance Documentary All U.S. Investors Need to See*, MarketWatch (Apr. 4, 2018), https://www.marketwatch.com/story/finance-documentary-the-china-hustle-revisits-chinese-reverse-mergers-and-activist-short-sellers-2018-03-30 (last visited July 31, 2026).

24.     Defendants have followed a similar pattern in prior campaigns against other public companies, publishing critical reports shortly after or in connection with disclosing a short position in the target company's securities. On information and belief, the short reports immediately preceding the release of the Datasection report failed to provide the returns that Defendants and their investors wanted, motivating Defendants to fabricate and sensationalize their report on Datasection.

25.     On October 8, 2025, Defendants published a fifteen-page report titled "Our INVESTIGATION Indicates Japanese Firm Datasection (TYO: 3905) Is Illegally Providing NIVIDA [sic] GPUs to BLACKLISTED Chinese Firm Tencent" (a copy of which is attached as Exhibit A). The Report was calculated to falsely convey, and did falsely convey, that Datasection was engaged in criminal conduct.

26.     Defendants asserted that Tencent, "a Chinese-owned company," was the "large cloud service provider putting $272 million behind Datasection's planned supercluster of restricted NVIDA B200 GPUs in Japan," and declared that "providing cutting-edge GPUs to China-owned firms is severely restricted and violates US export controls." Defendants went further still, falsely proclaiming that "Tencent's blacklisting by the United States" made the matter a "potentially . . . explosive international scandal," and representing to its readers that "we have already notified authorities in Japan and in the US of what appears to be grossly illegal practices and expect a swift response."

27.     Defendants compounded these accusations by falsely claiming that Japanese banks had "proverbially slammed the door in CEO Norihiko Ishihara's face, apparently recognizing the scheme's blatant illegality." Defendants also asserted that "[t]he Bureau of Industry and Security (BIS) expressly restricts the use of NVIDIA chips, like the B200, from reaching China or any data

9

center facilitating Chinese AI training," and that "Datasection's work with Tencent is a flagrant violation and could result in a blacklisting."

28.    Defendants claimed that based on the alleged violations of law, "Datasection and Tencent (if that is indeed their China-based backer as we have heard)" would "be forcibly decoupled," resulting in "near total annihilation for Datasection." Defendants summarized this narrative by declaring that "Datasection Appears to Be Running Afoul of Well-Known Rules Prohibiting the Use of Advanced NVIDA [sic] GPUs by China-owned Companies."

29.    Defendants closed the Report with a final statement designed to cement the false impression of imminent legal jeopardy for Datasection, stating: "In our view, what Datasection is doing here is illegal and we have contacted the appropriate authorities at the BIS and Homeland Security along with officials in Japan. We at Wolfpack intend to keep hunting in Japan."

30.    Taken together, these statements were false and defamatory, accused Datasection of criminal export-control violations and deliberate concealment, and were published with the intent, or at minimum the reckless disregard, to devastate Datasection's reputation and market value.

31.    To maximize the damage to Datasection's reputation in its home country of Japan, Defendants also released a version of the Report that was translated in Japanese.

32.    Defendants further spread Defendants' false and defamatory statements by posting about the Report on X (formerly Twitter) separately in both English and Japanese. Like the Report, these posts asserted that Datasection's actions were "illegal under US law" and threatened: "We

have already shared our findings with Japanese and US authorities."[3] The Japanese post has been viewed over 1.3 million times—representing more than 1% of Japan's population.

33.     The Report's falsehoods were republished and amplified by other financial commentary and media, demonstrating that the accusations were reasonably understood as statements of fact and foreseeably compounding the harm to Datasection with each new iteration.

34.     The Bear Cave, in its October 12, 2025 weekly roundup, reported that "Wolfpack alleged that Tencent 'is the company's sole major customer' and was 'behind Datasection's planned supercluster of restricted NVIDIA B200 GPUs in Japan,' likely in violation of U.S. export controls on the valuable technology."[4]

35.     The Report also was flagged the same day in a brief Reuters News wire item, which linked out to the source text, further widening the audience exposed to Defendants' short-selling attack on Datasection before any of the underlying allegations could be tested.[5]

36.     This attack was successful and translated directly into market harm. Datasection's shares closed 14% down on the same day the Report was released, and Defendants amplified the accusations on social media.[6]

---

[3] Wolfpack Research (@WolfpackReports), X (Oct. 8, 2025, at 3:01 AM), https://x.com/WolfpackReports/status/1975758386382672313 (last visited July 31, 2026); Wolfpack Research (@WolfpackReports) X (Oct. 8, 2025, at 3:03 AM), https://x.com/WolfpackReports/status/1975759030413914143 (last visited July 31, 2026).

[4] Edwin Dorsey, *The Bear Cave #295: New Activist Reports, Recent Resignations, and Tweets of the Week*, The Bear Cave (Oct. 12, 2025), https://thebearcave.substack.com/p/the-bear-cave-295 (last visited July 31, 2026).

[5] BRIEF-Wolfpack Research Says Short Japanese Firm Datasection, Reuters (Oct. 8, 2025), https://www.tradingview.com/news/reuters.com,2025:newsml_FWN3VO2SL:0-wolfpack-research-says-short-japanese-firm-datasection/ (last visited July 31, 2026).

[6] Jacob Adelman, *China's Tencent Uses 'Weakest Link' in Export Rules to Access Nvidia's Top Blackwell Chips*, Barron's (Dec. 22, 2025), https://www.fastbull.com/news-detail/chinas-tencent-uses-weakest-link-in-export-rules-news_2100_0_2025_4_2296_3 (last visited July 31, 2026).

37.    Datasection responded later the same day, specifically and categorically denying Defendants' allegations of illegality. Datasection issued a public notice stating that there was "absolutely no truth to such claims" and that "[t]he Company has advanced the relevant project in full compliance with all applicable laws and regulations, with confirmation from external experts, including legal counsel in both the United States and Japan."[7]

38.    The Report's falsehoods nevertheless continued to metastasize even after Plaintiff's public denial. One financial newsletter that week was headlined "Export Violations & Collapsing DAT Premiums" and described the Report as a "bombshell," stating that Datasection was "illegally funneling restricted NVIDIA B200 chips to Tencent," and characterizing the conduct as "a flagrant violation of export controls," adding that the stock "cratered 23.9% through week's end as institutional investors fled and regulatory scrutiny intensified." The newsletter observed a "[m]ass [i]nstitutional [e]xodus" among Datasection's major shareholders.[8]

39.    To date, no regulator has contacted Datasection regarding the allegations in the Report, no enforcement action has been brought against Datasection, and no regulator has confirmed any violation (because Datasection has not violated the law). The Report was, and remains, nothing more than a self-serving short-seller attack published with knowledge of its falsity or at least reckless disregard for the truth.

40.    The Report's allegations were and remain categorically false.

41.    Datasection has never sold any GPUs to Tencent.

---

[7] *Notice Concerning the Report Released Today by Wolfpack Research*, Datasection (Oct. 8, 2025), https://www.datasection.co.jp/en-financial-report/en-ir-20251008001.pdf (last visited July 31, 2026).

[8] *Weekly Wrap-Up: Sunday 10/12/25*, Activ8 Insights (Oct. 12, 2025), https://news.activ8insights.com/p/weekly-wrap-up-sunday-10-12-25 (last visited July 9, 2026).

42.    Tencent is not "blacklisted" under any U.S. export controls or sanctions laws or regulations.

43.    The BIS does not impose a license requirement on the provision of NVIDIA GPU computing power to a Chinese-owned company so long as the provider does not have knowledge and has not ignored red flags amounting to willful blindness that the computing power will be used to train an AI model for a weapons-of-mass-destruction or military-intelligence end use or end user for an entity headquartered in China or certain other jurisdictions.

44.    Defendants' central thesis that Tencent was Datasection's customer was based not on any verified documentation, but on what Defendants themselves characterized as industry rumor and secondhand statements from unnamed former employees. Notwithstanding this unsupported foundation, the Report's headline and ultimate conclusions were unqualified, falsely stating that Defendants' investigation "[i]ndicates" that Datasection was "[i]llegally [p]roviding" GPUs to a blacklisted firm.

45.    In the Report, Defendants wrongly and recklessly state the law. The Report's illegality charge rested entirely on the premise that Datasection "need[s] a license from the BIS to provide computing power to any Chinese-owned company." That premise is legally incorrect. As Barron's later reported, citing a sanctions lawyer who previously served as a U.S. government sanctions policy adviser, "[e]xport rules bar Chinese companies from acquiring advanced U.S. chips, but don't stop them from accessing those chips' computing power remotely unless the companies are considered special security risks."[9] Barron's likewise reported that "[a]ccessing Blackwell chips in the cloud avoids violating U.S. export restrictions that bar Chinese companies

---

[9] Adelman, *supra* note 6.

from owning those chips themselves."[10] Defendants, in other words, did not merely falsely state the facts about Datasection; they falsely stated (and continue to falsely state) the governing law.

46.    As a direct and proximate result of Defendants' false statements, Datasection suffered actual reputational, financial, and business harm, including a sharp decline in Datasection's stock price, a loss of confidence among shareholders, business partners, and financiers, and damage to Datasection's reputation in the industry and with the investing public. Defendants' false accusations caused concrete business harm beyond the immediate decline in Datasection's stock price and reputational harm. Governmental, financial, and commercial counterparties treated the Report as raising serious questions about the legality and viability of Datasection's AI data-center business, resulting in harm to existing and prospective project relationships, disruption to financing efforts, restrictions on GPU assets, lost business opportunities, and increased legal, professional, financing, and mitigation costs. These harms include damage to Datasection's business relationships, financing opportunities, asset liquidity, operational flexibility, reputation, and goodwill. For example, in a separate dispute concerning one of Datasection's data-center projects, a counterparty cited the Report to challenge the legality of Datasection's business and obtain a provisional attachment over Datasection's GPUs.

47.    Conversely, by publishing the false statements, Defendants precipitated a decline in Datasection's stock price and, upon information and belief, profited from financial positions designed to benefit from that decline.

48.    On October 14, 2025, Datasection's counsel sent a letter to Wolfpack Research identifying the false and defamatory statements in the Report, explaining that Tencent is not subject

---

[10] *Id.*

to any U.S. sanctions or export-control restrictions applicable to Datasection's business, and demanding that Wolfpack Research immediately retract the Report and cease its dissemination.

49.     Rather than retract the Report, Wolfpack Research—through counsel purporting to represent "WPR, LLC ('Wolfpack')"—responded on October 20, 2025, refusing to remove the Report from its website and asserting that the Report was "accurate, well-sourced, and constitutes protected speech."

50.     On October 22, 2025, Datasection's counsel wrote again, explaining that the Export Administration Regulations licensing requirements Wolfpack Research cited for exports of GPUs to China do not apply to exports to Japan or Australia—the publicly disclosed locations of Datasection's data centers—and that, even accepting Wolfpack Research's version of the facts, its own purported legal premise was incorrect. On November 20, 2025, Wolfpack Research's counsel responded by threatening further publications against Datasection if it continued to press its claims, warning that "[i]f [Datasection] didn't like Wolfpack's first report, just wait until they see the second (or the third or the fourth)," and that "[e]scalation also invites further scrutiny."

51.     Wolfpack Research's continued publication of the Report and threat to publish additional, similarly false reports demonstrates that the harm alleged in this Complaint is ongoing and likely to recur, and further evidences the malice and willfulness underlying Defendants' conduct.

52.     On information and belief, Defendant David was the primary author of the Report.

53.     Throughout the Report, the author(s) repeatedly represented that the accusations were the product of a collective effort, rather than the work of a single individual. The Report includes statements like "we believe," "we learned," "we spoke," "we heard," and "we have already notified authorities." It is unclear, however, whether these repeated references to "we"

15

reflect the work of an actual team of researchers, analysts, or investigators, or whether they were instead calculated to lend the Report an appearance of institutional rigor and collective diligence that a single individual publishing under a corporate label could not otherwise convey. Datasection accordingly reserves the right to amend this Complaint to name any additional individuals who participated in researching, drafting, reviewing, publishing, or disseminating the Report, and/or profited unfairly from its publication, once their identities are ascertained through discovery.

## CLAIMS FOR RELIEF

54.    Based on the preceding paragraphs, Datasection brings the following claims for relief:

## FIRST CLAIM FOR RELIEF
### (Defamation/Defamation Per Se)

55.    Datasection incorporates by reference paragraphs 1 to 54 of this Complaint.

56.    Defendants maliciously published, or caused to be published, false and defamatory statements about Datasection that injured Datasection's reputation and exposed Datasection to public contempt and ridicule.

57.    Defendants' statements identified Datasection by its full legal and corporate name and were of and concerning Datasection.

58.    On information and belief, Defendants knew that their written statements concerning Datasection were false, published those statements with reckless disregard for their truth or falsity, and/or published those false statements negligently. For example, Defendants falsely accused Datasection of providing NVIDIA GPUs to a blacklisted Chinese firm, while also falsely asserting that the BIS imposes licensing requirements on the provision of NVIDIA GPU computing power to Chinese-owned companies.

59. On information and belief, Defendants knew that their false and defamatory written statements about Datasection would hold Datasection up to contempt or ridicule.

60. To the extent any conditional or qualified privilege might otherwise attach to Defendants' statements as purported investigative reporting or opinion, Defendants' statements are not entitled to opinion protection because they assert several verifiably false facts. To the extent any statement could nonetheless be construed as opinion, readers were apt to draw the reasonable conclusion that the derogatory opinions expressed in Defendants' statements must have been based on undisclosed defamatory facts, rather than on facts disclosed to the audience, and such statements are therefore actionable as mixed opinion. Even assuming a conditional privilege would otherwise attach, Defendants abused any such privilege because their statements asserted verifiably false facts, were made with knowledge of their falsity or in reckless disregard of the truth, and were motivated by Defendants' financial interest in depressing Datasection's stock price rather than any legitimate informational purpose. Defendants' statements are therefore actionable regardless of whether Datasection is treated as a public or private figure for defamation purposes, because Defendants acted with actual malice under either standard.

61. Defendants disseminated false and defamatory statements concerning Datasection to a broad audience, including Datasection shareholders, governmental and regulatory authorities, and existing and prospective business partners.

62. Members of the public who read Defendants' statements, including holders of Datasection's stock and Datasection's current and prospective business partners, understood the statements to refer specifically to Datasection, by virtue of Defendants' express identification of Datasection by name.

17

63.     Defendants' statements concerning Datasection conveyed the existence of undisclosed facts that purportedly supported their accusations, including Defendants' invented and non-existent BIS license requirement purportedly restricting the provision of NVIDIA GPU computing power to any Chinese-owned company.

64.     On information and belief, Defendants' statements were interpreted by members of the public, including holders of Datasection stock and actual and prospective business partners, as assertions of fact or as being grounded in nonpublic facts possessed by Defendants.

65.     As a direct and special injury resulting from Defendants' publications, Defendants accused Datasection of committing serious criminal misconduct and engaging in conduct incompatible with the lawful and proper operation of its business. For example, Defendants asserted that Datasection had violated U.S. export-control laws, stating that "what Datasection is doing here is illegal" and that Datasection was "[i]llegally [p]roviding" restricted NVIDIA GPUs to a blacklisted Chinese firm. Defendants further impugned Datasection's fitness to conduct its core business as an AI infrastructure provider by claiming that Datasection's flagship data-center project was built upon a concealed and unlawful relationship with a blacklisted customer, and that Datasection's financing applications were rejected because its bankers recognized the "scheme's blatant illegality." Because these statements accused Datasection of both criminal conduct and conduct fundamentally incompatible with the honest, lawful, and competent operation of its business, they constitute defamation *per se.*

66.     Defendants have acted willfully, maliciously, outrageously, and with reckless disregard to the rights of Datasection, entitling Datasection to recovery of punitive damages.

67.     As a direct and proximate cause of Defendants' wrongful conduct, Defendants have unjustly profited and Datasection has suffered and will continue to suffer incalculable financial

18

losses in excess of $75,000 and other continuing harm and damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
### (Trade Libel)

68.     Datasection incorporates by reference paragraphs 1 to 67 of this Complaint.

69.     Defendants published false statements disparaging the quality, legality, and integrity of Datasection's products, services, and business operations, including but not limited to statements that Datasection unlawfully provided NVIDIA GPUs and computing power to Chinese entities, including Tencent, in violation of U.S. export-control laws; that Datasection lacked required export licenses; and that Datasection was supplying products to a "blacklisted" Chinese company.

70.     These statements were false. Among other things, no BIS licensing requirement restricting the provision of NVIDIA GPU computing power to Chinese-owned companies exists, Tencent is not "blacklisted" by the United States, and Defendants' assertions regarding Datasection's alleged unlawful conduct and concealment were fabricated or based on non-existent regulatory requirements.

71.     As a direct and proximate result of Defendants' publication of these false statements, Datasection suffered actual pecuniary loss, including a decline in the market price of Datasection's stock, harm to existing and prospective business relationships, and lost business opportunities.

72.     On information and belief, Defendants knew that their statements concerning Datasection were false, or published those statements with reckless disregard for their truth or falsity. For example, Defendants knowingly fabricated or recklessly disregarded the falsity of their

19

assertion that BIS imposes licensing requirements on the provision of NVIDIA GPU computing power to Chinese-owned companies generally, when no such requirement exists.

73.    Defendants' conduct was intentional, willful, outrageous, and/or undertaken with actual malice, entitling Datasection to recovery of punitive damages.

74.    As a direct and proximate cause of Defendants' unlawful conduct, Datasection has suffered and will continue to suffer incalculable financial losses in excess of $75,000, other continuing harm, and other damages in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
**(Tortious Interference with Prospective Contractual Relations)**

75.    Datasection incorporates by reference paragraphs 1 to 74 of this Complaint.

76.    At the time Defendant Wolfpack Research published the Report, Datasection had existing and reasonably anticipated prospective contractual relationships with current and prospective customers, business partners, and investors, including but not limited to banks and financial institutions from which Datasection sought financing and existing and prospective shareholders and financing partners.

77.    On information and belief, Defendants knew of these same prospective contractual relationships, or knew of facts from which their existence would reasonably be inferred, and published, or caused to be published, the false statements described above with the same purpose and intent of interfering with Datasection's prospective contractual relationships.

78.    Defendants knew of the existence of these prospective contractual relationships, or knew of facts from which the existence of such relationships would reasonably be inferred, given Defendants' stated short position in Datasection's stock and their stated purpose in publishing the Report, including their disclosed practice of researching and targeting companies engaged in large-scale capital-raising and financing activities.

20

79. Defendants published the false and defamatory statements described above with the purpose and intent of harming Datasection by preventing these prospective contractual relationships from occurring or continuing, specifically by causing customers, business partners, and investors to discontinue, decline to renew, or refrain from entering into business relationships with Datasection, and by depressing the market price of Datasection's stock for Defendants' own financial benefit as part of their short positions.

80. Defendants' conduct in publishing the false and defamatory statements was wrongful and improper under the circumstances, in that Defendants published statements they knew to be false, or that they recklessly disregarded the truth or falsity of, for the purpose of financial gain to the detriment of Datasection's business relationships.

81. As a direct and proximate result of Defendants' wrongful interference, one or more of Datasection's prospective contractual relationships have faced difficulties, including the filing by a creditor of an application for provisional attachment against Datasection's assets premised expressly on the Report, which was granted.

82. As a further direct and proximate result of Defendants' wrongful interference, Datasection has suffered damages in excess of $75,000, including lost business opportunities, harm to existing and prospective business relationships, reputational injury, and a decline in the market value of Datasection's stock, all in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### (Unjust Enrichment)

83. Datasection incorporates by reference paragraphs 1 to 82 of this Complaint.

84. Datasection's publicly traded equity represents a store of value for its shareholders and a resource on which Datasection itself depends to raise capital, attract investment, and maintain business relationships. Upon information and belief, prior to publishing the Report, Defendants

21

acquired or maintained a financial position designed to profit from a decline in the market price of that equity. Following publication of the Report, Defendants realized financial gains directly attributable to the resulting decline in Datasection's stock price—a decline achieved by trading on, and thereby extracting value from, the market confidence and reputation that Datasection had built.

85.    Upon information and belief, Defendants personally held or benefitted from a financial interest tied to a decline in Datasection's stock price and received financial benefits as a result of that decline.

86.    Defendants' profits were obtained through publication of the Report, which contained statements Defendants knew to be false or made with reckless disregard for their truth, timed and designed to trigger the very decline in Datasection's stock price from which Defendants profited. Defendants' financial gains are therefore directly and traceably connected to the wrongful conduct alleged in this Complaint and were obtained at Datasection's expense.

87.    By obtaining and retaining profits generated through the wrongful depression of Datasection's stock price, Defendants have been unjustly enriched at Datasection's expense, and equity and good conscience preclude Defendants from retaining those benefits.

88.    Datasection seeks restitution and disgorgement of all profits, proceeds, and other benefits unjustly obtained by Defendants as a result of the conduct alleged in this Complaint in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Datasection Inc. respectfully requests that this Court enter judgment in its favor and against Defendants, and grant the following relief:

(A) compensatory and consequential damages in an amount in excess of $75,000 to be proven at trial, including damages for harm to Datasection's reputation and goodwill, diminution

22

in the market value of Datasection's securities, lost business and financing opportunities, and costs incurred to respond to and mitigate the harm caused by Defendants' conduct;

(B) presumed and special damages recoverable for defamation per se;

(C) punitive damages in an amount sufficient to punish Defendants for their willful, malicious, and outrageous conduct and to deter similar conduct in the future;

(D) restitution and disgorgement of all profits, gains, and other benefits Defendants obtained as a result of the conduct alleged in this Complaint;

(E) a permanent injunction (i) requiring Defendants to retract and remove the Report and any related statements from all websites, social-media accounts, and other distribution channels under Defendants' control, and (ii) enjoining Defendants from republishing the statements found to be false and defamatory or from publishing further false statements concerning Datasection of the kind alleged in this Complaint;

(F) pre-judgment and post-judgment interest as permitted by law;

(G) attorneys' fees, litigation expenses, and costs of suit to the extent authorized by law; and

(H) such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff Datasection Inc. demands a jury trial in this action for all claims so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

**DATED:** July 31, 2026

Respectfully submitted,

*/s/ Michael A. Schwartz*
Michael A. Schwartz (PA 60234)
Abigail A. Hazlett (PA 313387)
Jessica C. McClellan (PA 335578)
Troutman Pepper Locke LLP
Two Logan Square
18th and Arch Streets
Philadelphia, PA 19103
Telephone: (215) 981-4494
Email: michael.schwartz@troutman.com

Ali Mojibi
(*pro hac application forthcoming*)
Covington & Burling LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
Telephone: (424) 332-4803
Email: amojibi@cov.com

Peter Lichtenbaum
Brenden J. Cline
(*pro hac applications forthcoming*)
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
Email: plichtenbaum@cov.com
         bcline@cov.com

EXHIBIT A

**Report Date:** October 8, 2025
**Company:** Datasection, Inc.
**Ticker: (**3905.TYO)
**Industry:** "Data Center"
**Stock Price (Y):** ¥1,899
**Market Cap (Y, Billions):** ¥42 billion



## Our INVESTIGATION Indicates Japanese Firm Datasection (TYO: 3905) Is Illegally Providing NIVIDA GPUs to BLACKLISTED Chinese Firm Tencent

- We believe Tencent is the mystery "large cloud service provider" putting $272 million behind Datasection's planned supercluster of restricted NVIDIA B200 GPUs in Japan.[1] Providing cutting-edge GPUs to China-owned firms is severely restricted and violates US export controls and betrays Japan's national security interests as well. Tencent's blacklisting by the United States because of its ties to the Chinese military make this potentially an explosive international scandal. We have heard that Datasection's CEO Norihiko Ishahara is trying to get government subsidies and funding, which is why we have already notified authorities in Japan and in the US of what appears to be grossly illegal practices and expect a swift response.

- We learned from multiple sources that it is well-known in the industry that Datasection's mystery sole datacenter customer is China-based. We learned that as Datasection has sought out financing, they have been quietly revealing to interested parties that Tencent is the mystery customer behind their initial order of 5,000 GPUs in July and a second order of 10,000 GPUs in October.[2] We have heard that Japanese banks have proverbially slammed the door in CEO, Norihiko Ishihara's face, apparently recognizing the scheme's blatant illegality. The CEO crawled back to a Singaporean firm with ties to China for financing.

- A former employee of Datasection revealed to us that the CEO initially hid the identity of the mystery backer, even from his own staff. This former employee believed that the CEO used NowNaw Japan (NNJ) to mask Chinese funding. They also pointed out that NNJ is closely tied to China and to Tencent in particular, and that one of its entities is in Tencent's office in China. Datasection denies that NNJ is a related party, but we think this is false since Norihiko Ishihara was an original director and promoter for NNJ.

- KDDI is a major Japanese telecom that offers data center services, and when it announced in June 2024[3] that it would be working with Datasection and several other partners to build the "Largest AI Data Center in Asia" it was a huge moment for Datasection. But we learned from a former executive for KDDI that KDDI does *not* have a current business relationship with Datasection. Another former employee from KDDI claimed the various parties stopped talking in December 2024. We think this explains why KDDI has dumped more than half its stake in Datasection starting last week.[4] Apparently, KDDI did not think Datasection had the capacity to be involved and cut them out when KDDI was able to establish a direct relationship with Hewlett Packard

Enterprises. Following KDDI's lead is Nippon Life who just yesterday slashed their reported stake in Datasection from 6.69% to zero.[5]

- Shockingly, we learned from multiple former KDDI employees that Datasection's GPUs are not going to be housed at the location that had originally been touted as Asia's largest datacenter (how could they be when KDDI and Datasection are no longer talking?), and that no one in the industry knows where Datasection's GPUs are going. There is a rumor in the industry that Datasection is using foreign firms because Japanese companies don't want to work with them due to their affiliation with China.

- We learned from former KDDI employees that the only reason Datasection was involved was because the CEO Norihiko Ishihara had a personal connection with Bob Xia, a mysterious character who is rumored to have influence with Supermicro and NVIDIA.

- We believe the company's Chinese backing was behind Datasection's decision to change auditors. Just days before the June 3rd, 2024 announcement of its deal with KDDI and others, the company voted to switch auditors and moved Norihiko Ishihara from Chairman of the Board to CEO. The prior auditor was PwC Japan (tenured since 2018), and the new auditor is Amaterasu Limited Audit Company, a relatively unknown auditor that has few public clients and does not appear to be registered with the PCAOB.

- Datasection has relied on First Plus Financial Holdings for financing. This is a firm located in Singapore whose CEO has deep ties to China. Singapore is also reportedly[6] a conduit for the illegal smuggling of NVIDIA chips into China through distributors, shell companies, and reexport hubs. This year, Singaporean authorities charged three men with fraud for their role in smuggling AI chips to China.[7]

- The Bureau of Industry and Security (BIS) expressly restricts the use of NVIDIA chips, like the B200, from reaching China or any data center facilitating Chinese AI training. Datasection's work with Tencent is a flagrant violation and could result in a blacklisting. We expect Japanese officials to act given their close alignment with the United States.

- We expect Datasection and Tencent (if that is indeed their China-based backer as we have heard) to be forcibly decoupled which will result in near total annihilation for Datasection because we think that without Tencent, this is not a business worth investing in.

- One of the Directors for Datasection[8] is **John Ellis Bush Jr.,** the grandson of George H.W. Bush, the 41st president of the US, the nephew of George W. Bush, the 43rd President of the United States, and son of Jeb Bush, the former Governor of Florida and candidate for President in 2016. We think President Trump will not be *devastated* to learn that Jeb's son is a director for a foreign company that is enabling a Chinese military company access to restricted AI technology in an arrangement that bears more than a passing resemblance to Hunter Biden's role as an "independent director" at Burisma. Trump is not known for forgiving his enemies or others who have slighted him, so investors should expect Trump to seize on this opportunity to rub this atrocious scandal in the noses of his rivals in the Bush family.

## OUR INVESTIGATION OF DATASECTION'S MYSTERY CUSTOMER INDICATES IT IS TENCENT, WHICH IS TIED TO THE CHINESE MILITARY

**Datasection Announced It Plans to Build Japan's First Supercluster Powered by NVIDIA's B200 GPUs for a Mystery Customer; It Is Well Known in the Industry that They Are Backed by a China-Based Company**

When Datasection announced that it would be building Japan's first supercluster, powered by NVIDIA's B200 GPUs, it also said this move was spurred by a potential client they described as one of the largest cloud service providers, however the identity of this potential client is not provided.[9]

We learned from multiple sources that it is well known in the industry that Datasection's customer is China-based. Other prospective deals with non-China-backed companies like Supermicro, Fujitsu, or CUDO do not appear to have come to fruition.

We spoke with a former employee at Datasection, and he told us that the CEO initially kept the identity of this mystery customer a secret, even internally.

**We Learned from Former Employees of KDDI that Datasection's Collaboration on a Data Center Described as the "Largest AI Data Center In Asia" Has Been Dead Since Last Year, and None of Our Sources in the Industry Know Where Datasection Is Setting Up Its GPUs**

Datasection's recent announcements of a first 5,000 GPU order in July and a second 10,000 GPU order in October have sprung from an original deal announced in June 2024 where Datasection was included in a collaboration with KDDI, Supermicro, and Sharp to build the largest AI data center in Asia. We learned from the former employees of KDDI that Datasection was originally included in the deal because they were going to help KDDI acquire the needed GPUs, and it was believed that Norihiko Ishihara had connections needed to get NVIDIA GPUs.

However, former employees of KDDI told us that distance grew between KDDI and Datasection and that the collaboration was dead by December 2024. Apparently KDDI was able to get GPUs directly from Hewlett Packard Enterprise (HPE) in a deal that was announced in June 2025.

KDDI's growing distance from Datasection may explain why KDDI has slashed its stake in Datasection from 9.5% to 3.7% in September and October.

**What About Bob? Bob Xia of Livemood Inc. Appears to Be Reportedly Involved In Sourcing the GPUs. What Does He Know?**

Media reports as well as individuals we spoke with detail Norihiko Ishihara's involvement with NowNaw Japan which is purportedly a Web 3.0 version of "the American equivalent of TikTok."[10] A U.S. entity, Livemood Inc., produces an app with the same name, NowNaw, and

appears to operate a shockingly similar Web 3.0 platform.[11] Livemood Inc is a California Entity owned by Bob Xia.[12]

Below Bob Xia and Norihiko Ishihara are pictured in the press release announcing Sharp & KDDI would build Japan's largest data center with the help of Datasection and Supermicro.



**Source:** Press Release

Interestingly, Bob Xia's name is not mentioned in this photo. A source we spoke with pointed us to this photo explaining that Bob holds himself out to be an early investor in both SuperMicro & Nvidia. We heard from several former KDDI employees familiar with its Datasection deal that the company's promoted a relationship at the U.S Department of Commerce which enabled it to obtain GPUs earlier that other its competitors.

1. Neither NowNaw or Livemood Inc. is mentioned in this press release, so why is Bob Xia standing behind Norihiko Ishihara?
2. Does Bob Xia play any role in helping secure GPUs for Norihiko Ishihara?
3. Is Bob Xia the conduit that gives Datasection the confidence to tell potential customers it can secure GPUs earlier than its rivals?

**A Former Employee Told Us They Believed the CEO of Datasection, Norihiko Ishihara, Has Used NowNaw Japan to Mask Its Backing by a China Military Company. This Former Employee Also Pointed Out that One of NowNaw Japan's Subsidiaries Is Headquartered in Tencent's Building.**

NNJ is clearly playing a very key role. In August 2024, Datasection and NNJ announced a joint development agreement where they agreed to jointly develop and build an AI cloud service system.[13] In July 2025, Datasection announced that through NNJ, they had entered into a "a large-scale service usage agreement with a customer who is one of the world's largest cloud service providers."[14] That first deal was for 5,000 GPUs, but in October, they released another press release claiming that they used NNJ to make an even larger order of 10,000 NVIDIA GPUs. They even posted a photo on X.com (FKA as twitter) of their purported GPU's but made sure to redact the shipping labels on the boxes as shown below:



**Source:** Datasection X.com Post

Datasection has explicitly denied that NNJ is a related party, but that does not appear to be true.[15] NNJ was founded by the CEO of Datasection, although his personal involvement in NNJ is absent from his company bio.[16]

We uncovered a document that we had translated which states that Norihiko Ishihara was originally a representative director of NowNaw Japan:

東京都港区赤坂一丁目１４番１５号
ナウナウジャパン株式会社

| 役員に関する事項 | 取締役 | 石 原 紀 彦 | | |
|---|---|---|---|---|
| | | | 令和　６年　６月２１日辞任 | |
| | | | 令和　６年　７月１６日登記 | |
| | 取締役 | 近 江 麗 佳 | 令和　６年　６月２１日就任 | |
| | | | 令和　６年　７月１６日登記 | |
| | 東京都世田谷区桜新町一丁目１０番７号<br>代表取締役　　石 原 紀 彦 | | | |
| | | | 令和　６年　６月２１日辞任 | |
| | | | 令和　６年　７月１６日登記 | |
| | 神奈川県横浜市南区六ツ川三丁目６２番地７５<br>代表取締役　　近 江 麗 佳 | | 令和　６年　６月２１日就任 | |
| | | | 令和　６年　７月１６日登記 | |

Since he was the original director, it makes sense that Norihiko Ishihara reportedly spent time promoting NNJ across Asia. Specifically, an interview[17] he gave in October 2022 seems to indicate that he had a leadership role at NNJ.

> *"One of Ishihara's current focuses is the launch of a social networking site called "NowNaw" in Japan. Ishihara describes NowNaw as "the American equivalent of TikTok."*

NNJ is also the shareholder of an entity whose English translation is Dalian Shouying Technology Co., Ltd (Dalian).



*Note: Google erroneously translates NowNaw as Nao Nao*

The legal representative for this entity is Omi Reika,[18] who is also the representative director and owns 90% of NNJ.[19] Dalian is located in the Dalian Tencent Building.



**Datasection Claims NNJ and Its Engineers Can Help Them Develop "A New AI Cloud Service System" But NNJ Is a Tiny Company Whose Only Expertise Appears to Be Pivoting to the Latest Fads**

NNJ has a job posting that indicates NNJ has 30 employees. However, when we looked at how many of these employees were insured, there are only 4.



Does a tiny company like NNJ really have the engineering expertise necessary to build an AI Cloud Service System? We doubt it, but Tencent certainly does. Perhaps that is why the job posting above requires the candidate to speak two languages out of Chinese/Japanese/English.

We also are having a hard time taking NNJ seriously as a firm with deep experience in AI cloud service system development for data centers when the company appears to have switched its primary focus several times. Below is a list from the founding document of the various types of business that NNJ would conduct, it includes:

- Event planning
- Managing influencers
-  Publishing business
- Game and system development
- Advertising agency business
- Consulting

There are several other generic businesses listed as well, but one thing they *do not* mention is data centers. There is nothing in this original plan about data centers.



By October 2022, when Datasection's CEO Norihiko Ishihara was interviewed by the KEIO leadership center he described it as the American version of TikTok and was offering augmented reality and ecommerce as services.[20]

In July 2025, when announcing their deal together, Datasection included a description of NNJ's business and amusingly it included a whole new set of business activities.



**First Plus Financial Holdings, A Singaporean Firm with Deep Connections to China Stepped into the Breach and Provided Financing When the Japanese Banks Balked**

First Plus Financial Holdings is headquartered in Singapore, which is reportedly a major hub for smuggling NVIDIA GPUs.

The CEO is Zhi Bo Li who has deep China connections. Prior to First Plus Financial, Zhi Bo Li worked as a Non-Independent & Non-Executive Director at Ascent Bridge Ltd. from 2019 to 2022, as a Senior Managing Director-Global Capital Markets at Ping An Trust Co., Ltd. from 2015 to 2019, and as the General Manager-International Business at Sino-Australian International Trust Co., Ltd. from 2012 to 2015.

Why did the CEO of Datasection turn to First Plus Financial instead of one of the Japanese Banks? After all, the CEO used to work for Goldman Sachs and is reportedly connected to the Japanese intel community, so what is the source of difficulty?

We heard that once the Japanese banks learned that Tencent is Datasection's real backer, they all closed their doors.

First Plus Financial knows it has leverage, which is why we think on September 10th, 2025, they received warrants for 44 million shares (potentially 64% dilution) with an excise price that was at 44% of the face value of the stock on the prior closing day.[21]

**Datasection Appears to Be Running Afoul of Well-Known Rules Prohibiting the Use of Advanced NVIDA GPUs by China-owned Companies**

There are severe restrictions on NVIDIA's GPUs. NVIDIA itself warns that since Q3 2024 the US government has licensing requirements for numerous models, including the B200, for exports to China or to companies headquartered in China.

During the third quarter of fiscal year 2024, the USG announced new and updated licensing requirements for exports to China and Country Groups D:1, D:4, and D:5 (including but not limited to, Saudi Arabia, the United Arab Emirates, and Vietnam, but excluding Israel) of our products exceeding certain performance thresholds, including, but not limited to, the A100, A800, H100, H800, L4, L40, L40S RTX 4090, GB200 NVL72, and B200. The licensing requirements also apply to the export of products exceeding certain performance thresholds to a party headquartered in, or with an ultimate parent headquartered in, Country Group D5, including China.

If we go to the Unites States Bureau of Industry and Security (BIS) which specifically oversees the exports of GPUs, we can see that the guidance states that controls have been placed on the chips and services containing integrated circuits that could potentially be used by the Chinese for military purposes. It also specifies that a business, such as a data center, must get a license if it wishes to provide a company headquartered in China with restricted computing power.

The following activities may trigger a license requirement under the catch-all controls of part 744 of the EAR when there is "knowledge" (see inset below for further information about "knowledge" under the EAR) that the AI model will be used for a WMD or military-intelligence end use/user:

- Exports, reexports, or transfers (in-country) of advanced computing ICs and commodities subject to the EAR to any party, such as foreign Infrastructure as a Service (IaaS) providers (e.g., data center providers), when the exporter, reexporter, or transferor has "knowledge" that the IaaS provider will use these items to conduct training[2] of AI models for or on behalf of parties headquartered in D:5 countries (including China) or Macau.[3]

Additionally, Japanese policy is aligned with US policy on the matter of controlling exports to China that could be used in weapons or their development.

These export controls coming from the US and echoed by Japan clearly are relevant for Datasection. They are building a data center powered by NVIDIA B200 GPUs, so they need a license from the BIS to provide computing power to any Chinese-owned company.

We doubt BIS has given them any such license considering that if BIS had granted a license we think they would announce it with tremendous fanfare and then talk about it in every subsequent press release. The primary reason we think that will *never* happen is because Datasection customer does not appear to be just any China-based company—but Tencent, which was identified by the US as having ties to the Chinese military:

## U.S. Defense Department says Tencent and other Chinese companies have ties to China's military


cbsnews.com/news/tencent-ban-catl-stock-us-department-of-defense

January 7, 2025

In our view, what Datasection is doing here is illegal and we have contacted the appropriate authorities at the BIS and Homeland Security along with officials in Japan.

We at Wolfpack intend to keep hunting in Japan. Stay tuned for our next report.

---

[1] Datasection PR July 4th, 2025
[2] See PRs for the first and second orders.
[3] See KDDI press release from June 2024.
[4] See various stock sale notifications from KDDI in Datasection. Our understanding is that there were several sales, starting on 9/29/2025 and concluding on 10/6/2025 where the ownership stake of KDDI fell from an initial 9.5% to a concluding 3.7% (so far)
[5] Nippon Life shareholder report
[6] See article from the Association of Certified Sanctions Specialists
[7] See Reuters article "Singapore charges three with fraud that media link to Nvidia chips."

[8] Datasection's Website



**Director**

**John Ellis Bush Jr.**   John Ellis Bush Jr.

He is a businessman with extensive experience in real estate and investment. He currently serves as managing partner of Jeb Bush & Associates LLC, as well as partner at Bush Realty LLC and Finback Investment Partners. He also serves on the board of director of Rio Grande E&P and is active in the nonprofit organizations Barbara Bush Foundation and the National Alliance for Public Charter Schools. He holds a bachelor's degree from the University of Texas and a master's degree in real estate from Florida International University.

[9] This is according to a google translation of the announcement.
[10] Keio Leadership Center
[11] Sipiapa.org
[12] California Secretary of State Filings
[13] See PR from Datasection in English from August 19th, 2024
[14] See PR from July 10th, 2025
[15] See PR from August 19th, 2024
[16] See for yourself, pulled from the company's bio:



**President and CEO**

**Norihiko Ishihara**   ISHIHARA NORIHIKO

After graduating from the Faculty of Law at Keio University in 2001, he joined Goldman Sachs Asset Management Co., Ltd. He gained a wide range of experience at Goldman Sachs Securities and other firms, including investment banking, domestic and international investment, global project management, and management of listed companies. After being appointed Representative Director and CEO of Bulk Holdings Co., Ltd. in 2018, he has served as CEO of Strategic Cyber Holdings LLC, an advisory board member of Cybergym Control Ltd., and Representative Director and CEO of Cybergym Japan Co., Ltd. In April 2024, he was appointed Chairman of the Board of Directors of the Company, and in June, he was appointed Representative Director, President and CEO.

[17] See this article from the KEIO leadership center about the October 2022 interview.
[18] See this webpage for company profile
[19] A description of NNJ is provided by Datasection in this document that specifies Omi Reika is the representative director and owns 90% of NNJ
[20] See this article from the KEIO leadership center about the October 2022 interview.
> "One of Ishihara's current focuses is the launch of a social networking site called "NowNaw" in Japan. Ishihara describes NowNaw as "the American equivalent of TikTok." (google translation)

[21] See PR from September 10th, 2025, "Notice Regarding the Issuance of the 23rd Series of Stock Acquisition Rights…" Number of potential shares from the issuance is 44 million (vs shares outstanding 22.1 million, plus potential shares of 3.1 million. Exercise price of Y1,250)

## Financial Disclaimer

Please be advised that the reports on this website have been prepared by WPR, LLC, ("Wolfpack Research" or "WPR" or "we" or "us").  Wolfpack Research is under common control and affiliated with Wolfpack Capital Partners Manager, LLC ("Wolfpack Capital Partners"). Wolfpack Research is an online research publication that produces due diligence-based reports on publicly traded securities, and Wolfpack Capital Partners is an exempt reporting advisor that is not currently registered with U.S. Securities and Exchange Commission.  None of our trading or investing information, including the Content, WPR Email, Research Reports and/or content or communication (collectively, "Information") provides individualized trading or investment advice and should not be construed as such.

The reports on this website are the property of Wolfpack Research.  Wolfpack Research and Wolfpack Capital Partners, collectively their respective affiliates and related parties, including, but not limited to any principals, officers, directors, employees, members, clients, investors, consultants and agents, are referred herein to as "Wolfpack".

We publish Information regarding certain stocks, options, futures, bonds, derivatives, commodities, currencies and/or other securities (collectively, "Securities") that we believe may interest our Users ("Wolfpack Offerings"). You are reading a short-biased opinion piece. Obviously, we will make money if the price of the covered issuer stock declines. **As of the time and date of each report, Wolfpack is short the securities of, or derivatives linked to, the securities of the subject issuer (each, a "Covered Issuer"), unless otherwise stated in the report.**  Upon the publication of each report, we intend to begin covering a substantial majority of our short positions.  Our risk reduction is not a reflection of a lack of conviction in our opinions or the facts presented; rather, it has to do with managing risk in a manner that is prudent for a fiduciary of our investors' money.

Wolfpack will continue transacting in the securities of Covered Issuer for an indefinite period after a report on a Covered Issuer, and we may be net short, net long or flat positions in the Covered Issuer's securities after the initial publication of a report, regardless of our initial position and views herein.

The Information is provided for information purposes only. Wolfpack does not solicit the purchase of or sale of, or offer any, Securities featured by and/or through the Wolfpack Offerings and nothing we do and no element of the Wolfpack Offerings should be construed as such.

Without limiting the foregoing, the Information is not intended to be construed as a recommendation to buy, hold or sell any specific Securities, or otherwise invest in any specific Securities. Trading in Securities involves risk and volatility. Past results are not necessarily indicative of future performance.

The Information represents an expression of our opinions, which we have based upon generally available information, field research, inferences and deductions through our due diligence and analytical processes.

We do not provide "price targets", although we may express our opinion of what the security is worth. An opinion of the value of a security differs from a price target in that we do not purport to have any insight as to how the market might value a security – we can only speak for how we view its value. We therefore do not hold a position until it reaches a certain price target, nor do we always hold positions until they reach the price at which we have expressed a valuation opinion

Due to the fact that opinions and market conditions change over time, opinions made available by and through the Wolfpack Offerings may differ from time-to-time, and varying opinions may also be included in the Wolfpack Offerings simultaneously.

To the best of our ability and belief, all information is accurate and reliable, and has been obtained from public sources that we believe to be accurate and reliable, and who are not insiders or connected persons of the applicable Securities covered or who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer. However, such information is presented on an "as is," "as available" basis, without warranty of any kind, whether express or implied. Wolfpack makes no representation, express or implied, as to the accuracy, timeliness or completeness of any such information or with regard to the results to be obtained from its use.

All expressions of opinion are subject to change without notice, and Wolfpack does not undertake to update or supplement any of the Information. We also have no duty or obligation to update this report or update you on the size or direction of any position we hold in a Covered Issuer.

The Information may include or may be based upon, "Forward-Looking" statements as defined in the Securities Litigation Reform Act of 1995. Forward-Looking statements may convey our expectations or forecasts of future events, and you can identify such statements: (a) because they do not strictly relate to historical or current facts; (b) because they use such words such as "anticipate," "estimate," "expect(s)," "project," "intend," "plan," "believe," "may," "will," "should," "anticipates" or the negative thereof or other similar terms; or (c) because of language used in discussions, broadcasts or trade ideas that involve risks and uncertainties, in connection with a description of potential earnings or financial performance.

There exists a variety of risks/uncertainties that may cause actual results to differ from the Forward-Looking statements. We do not assume any obligation to update any Forward-Looking statements whether as a result of new information, future events or otherwise, and such statements are current only as of the date they are made. You acknowledge and agree that use of Wolfpack Information is at your own risk.

In no event will Wolfpack or any affiliated party be liable for any direct or indirect trading losses caused by any Information featured by and through the Wolfpack Offerings. You agree to do your own research and due diligence before making any investment decision with respect to Securities featured by and through the Wolfpack Offerings. You represent to WPR that you have sufficient investment sophistication to critically assess the Information.

If you choose to engage in trading or investing that you do not fully understand, we may not advise you regarding the applicable trade or investment. We also may not directly discuss personal trading or investing ideas with you. The Information made available by and through the Wolfpack Offerings is not a substitute for professional financial advice. You should always check with your professional financial, legal and tax advisors to be sure that any Securities, investments, advice, products and/or services featured by and through the Wolfpack Offerings, as well as any associated risks, are appropriate for you.

You further agree that you will not distribute, share or otherwise communicate any Information to any third-party unless that party has agreed to be bound by the terms and conditions set forth in the Agreement including, without limitation, all disclaimers associated therewith.

If you obtain Information as an agent for any third-party, you agree that you are binding that third-party to the terms and conditions set forth in the Agreement. Unless otherwise noted and/or explicitly disclosed, you should assume that as of the publication date of the applicable Information, Wolfpack (along with or by and through any affiliates)), together with its clients and/or investors, has an investment position in all Securities featured by and through the Wolfpack Offerings, and therefore stands to realize significant gains in the event that the price of such Securities change in connection with the Information.

We obviously believe all statements included in our report made by former employees, confidential sources, experts, and whistleblowers are reliable (we think everything we say or cite is reliable); however, you should know that these

sources likely not just biased but may even have a financial interest in our short report. We sometimes pay former employees indirectly through an expert network to speak with us, and these former employees may hold a grudge against their former employer. In some cases, we directly pay our sources a fixed fee or enter into a profit-sharing agreement with a source. In cases where we believe a whistleblower suit with a regulatory agency is appropriate, we may share a financial interest with a source in the potential award.

We intend to continue transacting in the Securities featured by and through the Wolfpack Offerings for an indefinite period, and we may be long, short or neutral at any time, regardless of any related information that is published from time-to-time.

Therefore, you should assume that upon publication of this report, we will, or have begun to, close a substantial portion – possibly the entirety – of our positions in the Covered Issuer's securities. By the time you read this report, we may be covering or have already covered (i.e., bought back) our short position, and we are unlikely to increase our short positions unless it is in our financial interest to do so.